## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| **PERRY CASSELLE,** ) | |
| **1571 Sunstone Drive** ) | |
| **Tysons Corner, Virginia 22102** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **ANTHONY FOXX, SECRETARY,** ) | **Case No. _____** |
| **UNITED STATES DEPARTMENT** ) | |
| **OF TRANSPORTATION** ) | |
| **1200 New Jersey Avenue, Southeast** ) | |
| **Washington, DC 20590,** ) | |
| ) | |
| **Serve:** ) | |
| ) | |
| **UNITED STATES ATTORNEY'S OFFICE** ) | |
| **FOR THE DISTRICT OF COLUMBIA** ) | |
| **Attn: Civil Process Clerk** ) | |
| **United States Attorney's Office** ) | |
| **555 4th Street Northwest** ) | |
| **Washington, DC 20530** ) | |
| *-Via Certified Mail* ) | |
| ) | |
| **UNITED STATES ATTORNEY GENERAL** ) | |
| **950 Pennsylvania Avenue NW** ) | |
| **Washington, DC 20530** ) | |
| *-Via Certified Mail* ) | |
| ) | |
| **ANTHONY FOXX, SECRETARY,** ) | |
| **UNITED STATES DEPARTMENT** ) | |
| **OF TRANSPORTATION** ) | |
| **1200 New Jersey Avenue, Southeast** ) | |
| **Washington, DC 20590,** ) | |
| *-Via Certified Mail* ) | |
| ) | |
| **and** ) | |
| ) | |
| **ANTHONY TISDALL** ) | |
| **7609 Bertito Lane** ) | |
| **Springfield, Virginia 22153** ) | |
| *-Via Certified Mail* ) | |
| ) | |
| **Defendants.** ) | |

_____

## CIVIL COMPLAINT FOR EQUITABLE AND
## MONETARY RELIEF AND DEMAND FOR JURY TRIAL

1.      Plaintiff Perry Casselle brings this suit against Defendant Anthony Foxx, United
States Secretary of the Department of Transportation ("DOT"), who oversees the Federal
Aviation Administration ("FAA"), (collectively, "FAA") for retaliating and discriminating
against him for engaging in protected activity in violation of Title VII of the Civil Rights Act of
1964, 42 U.S.C. § 2000e, *et seq.*, and against Anthony Tisdall, for violating his rights under the
First Amendment of the United States Constitution.

### INTRODUCTION

2.      Perry Casselle, an African American man, has worked for the Federal Aviation
Administration ("FAA") since August 1988.

3.      In about October 2010, Casselle attended the End of Season Meeting for the FAA
managers.  At the meeting, as part of a presentation, Michael Artist, a National Operations
Manager showed a racist and offensive video.

4.      Casselle subsequently complained about the video to Nancy Kalinowski, a
Caucasian female and the senior management official at the FAA.  Kalinowski was Ellen King's
direct supervisor; Ellen King is the direct supervisor over all NOMs, including Artist.

5.      Kalinowski shared Casselle's complaint with the National Operations Managers
("NOMs") under her management at the Warrenton, Virginia Command Center.

6.      In about 2010, Casselle began applying for promotions, specifically for positions
at the Command Center.  Steve McMahon told Casselle that Casselle needed more experience to
develop stronger qualifications known as "KSAs" (Knowledge, Skills, and Abilities).

7.      Casselle continued working in middle management, gaining three and a half

years' experience.  He began to apply for promotions again, in about February 2013, applying for seven positions at the Command Center from February 2013 to June 2013.

8.      Subsequent to Casselle's complaint, the FAA consistently failed to hire Casselle at the Air Traffic Control System Command Center.  In September 2014, the FAA refused to promote Casselle despite Perry being among the best-qualified candidates.

9.      Anthony Tisdall, a Caucasian man, was one of the NOMs under Kalinowski's management.  Tisdall worked closely with Artist.  Although Artist is no longer a NOM, he still works closely with NOMs and Command Center personnel as Manager of Tactical Operations in the Southeast region.

10.     Tisdall was the selecting officer for the September 2014 non-selection.

11.     Tisdall refused to promote Casselle in retaliation for Perry's complaint against his comrade NOM.

**PARTIES**

12.     Perry Casselle is an individual domiciled at 1571 Sunstone Drive, Tysons Corner, Virginia 22102 and is a citizen of the United States.  The FAA has employed Casselle since 1988.

13.     Defendant FAA, an agency of the United States Department of Transportation, is a federal agency responsible for regulation and oversight of all aspects civil aviation in the United States.  The FAA does so in part out of its headquarters and principal place of business at 800 Independence Avenue, Washington, DC 20591.

14.     The FAA employs more than two hundred fifty people in its Washington, DC location.

15.     Anthony C. Tisdall is an employee of the FAA and lives in Springfield, Virginia.

16.    Tisdall violated Casselle's First Amendment rights when Tisdall refused to select Casselle for the NOM position in September 2014.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this is an action arising under the laws of the United States, specifically, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.

18.    Pursuant to 42 U.S.C. § 2000e-5, this Honorable Court has jurisdiction over the matters described herein as Casselle exhausted his administrative remedies.

19.    This Court has personal jurisdiction over the FAA because the FAA is located in Washington, DC, and thus the FAA has substantial contacts with and conducts business in the state.

20.    Venue in this District and in this Division is appropriate pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(c), as the FAA has extensive and deliberate contacts in this District and Division, including its headquarters at 800 Independence Avenue, Washington, DC, at which Casselle performed work during his tenure with the FAA and substantial activity giving rise to this claim occurred within this judicial district.

## ADMINISTRATIVE EXHAUSTION

18.    On or about September 15, 2014, Casselle contacted a DOT Equal Employment Opportunity ("EEO") Counselor to try to informally resolve his complaint of discrimination and retaliation against Defendant, pursuant to 29 CFR § 1614.105.

19.    The parties did not achieve an informal resolution, and Casselle received Notice of Right to File a Discrimination Complaint on January 2, 2015.

20.     On or about January 14, 2015, Casselle filed a timely formal complaint of discrimination and retaliation against Defendant with the DOT pursuant to 29 CFR § 1614.106.

21.     On or about April 16, 2015, DOT completed its investigation of Casselle's Complaint.

22.     On or about May 13, 2015, Casselle timely requested a hearing with the Equal Employment Opportunity Commission pursuant to 29 CFR § 1614.108.

23.     More than 180 days have passed since Casselle filed his formal complaint of discrimination and retaliation with the DOT, and thus pursuant to 29 CFR § 1614.407(b), Casselle has exhausted his administrative remedies.

## FACTUAL ALLEGATIONS

### Tenure at the Federal Aviation Administration

22.     Casselle is a 53-year-old African American male living in Tysons Corner, Virginia.

23.     Casselle joined the FAA in October 1988 after serving as an air traffic controller in the United States Air Force.  After completing training at the FAA's academy in Oklahoma, Casselle began working at Cleveland Air Route Traffic Control Center ("Cleveland") as an air traffic controller in the GS-9 pay grade in February 1989.

24.     In Cleveland, Casselle progressed in the FAA's Systems Operations Organization (SYS OPS).  As Casselle gained experience, more advanced skills, and expertise in the traffic patterns, routes, and radar for three FAA Areas (Area is an FAA term referring to a region of airspace that includes several smaller regions called sectors), he was promoted multiple times.

25.     SYS OPS is responsible for planning, directing, implementing, overseeing, and continuously monitoring all programs related to air traffic control systems used by the FAA at the

Air Traffic Control System Command Center ("ATCSCC"), located in Warrenton, Virginia, and throughout the United States.

26.     Casselle was a GS-13 when he accepted his first position in air traffic management.  After about two and half years supervising air traffic controllers, in February 2005, Casselle became a Supervisor – Traffic Management Coordinator ("STMC") in the Traffic Management Unit.  Although the SMTC position was a lateral move and Casselle did not receive a pay raise, the position was more prestigious because it required advanced special skills that were difficult to obtain without working in multiple Areas (unlike Casselle, many air traffic controllers spend their entire careers working in one area). Subsequently, the SMTC position also leads to more opportunities to progress in FAA; for example, to become a National Operations Manager ("NOM"), an employee must be a SMTC first.  Casselle continued to progress within the FAA, becoming a Traffic Management Officer ("TMO") in June 2010.  As a TMO, Casselle was responsible for overseeing all air traffic at the airport to which he was assigned.

27.     The FAA has approximately 52 TMOs across thirty "core" airports and 22 Air Route Traffic Control Centers ("ARTCC") in the United States.  Cleveland is an ARTCC.

28.     As a TMO, Perry also frequently interacted with SYS OPS personnel at other facilities, including personnel at the Warrenton, Virginia Command Center.  TMOs specifically interact with National Operations Managers (NOMs).

29.     NOMs perform duties similar to those of the TMOs, but are responsible for one of five United States' regions, while TMOs are responsible for a core airport or an ARTCC.  TMOs and NOMs are both under the SYS OPS umbrella and face similar operational issues in their day-to-day duties; they are also both in the MSS3 pay grade.  TMOs are assigned to the field

facilities and NOMS report to the ATCSCC Manager under SYS OPS.  During Perry's time as a TMO, Ellen King, a Caucasian woman, was the Director of SYS OPS.

30.     However, because there are only five NOMs in all of the FAA, and because the NOM position generally leads to additional opportunities both within SYS OPS and in the private sector, the NOM position is very high profile.

31.     Past NOMs have gone on to hold higher-level management roles in SYS OPS and other FAA lines of business such as CDM Manager, ATCSCC Facility Manager, and Manager of Performance and Analysis, to name a few.

32.     Past NOMs have also received prestigious details.  For example, at least two former NOMS have received details to the Civil Air Navigation Services Organization ("CANSO"), and other former NOMs have been detailed to serve as the Deputy Vice President of SYS OPS and on the National Contract Team.

33.     In late 2010, the five NOMs were Rico Short, Mike Artist, Anthony Tisdall, Steve McMahon, and James Bedow.  Short was the only African American NOM; all of the others were Caucasian.

34.     The NOMs are a tight-knit group.

35.     Many of the NOMs previously served in lower level SYS OPS positions at ATCSCC, and subsequently, many of the NOMs have worked together for years prior to becoming a NOM.

36.     In or about 2010, Casselle began applying for promotions.  Casselle applied for an open NOM position, but did not receive the job.  Insert Name told Casselle that Casselle needed more experience.

37.     To obtain more experience and improve his qualifications for the NOM position, Casselle applied for a TMO position at the Detroit Metropolitan Wayne County Airport ("Detroit").

38.     Detroit is one of the FAA's 30 "core" airports.  Detroit has two high level facilities, with each being ranked as a Facility Level 11 (12 is the highest).  The Facility Level is determined based on a number of factors indicating traffic and complexity.

39.     Thus, because Detroit includes very high level facilities, the TMO position in Detroit was a promotion from Casselle's TMO position in Cleveland.  Because this was a promotion within the Great Lakes Region, no SYS OPS or ATCSCC personnel was involved in the promotion decision.

**A Racially Charged Video is shown at the October 2010 End of Season Meeting**

40.     From about October 26 to October 28, 2010, Casselle attended the End of Season Meeting with the FAA managers and SYS OPS personnel from around the country.

41.     NOM Short had just retired, on or about Oct. 1, 2010.

42.     At the meeting, Artist, one of the NOMs, gave a presentation on the national air traffic system's efficiency, in which he showed a video entitled "Terry Tate takes a Vacation."

43.     In light of Short's recent retirement, Artist showed the video as depiction of Short's role at the ATCSCC.

44.     The video depicted a large, black male character, "'Terrible' Terry Tate," played by a National Football League linebacker, running around a hotel, verbally and physically threatening staff to do their jobs.

45.     In the video, Tate's job is to increase office efficiency, which he does using threats, violence, and verbal abuse.  During his vacation, Tate, fed up with subpar service, tackles

several hotel employees that he perceives as underperforming. For example, after tackling one employee, Tate yells at him "you know I ordered these eggs forty minutes ago!"

46.     Tate returns to the office from his vacation and resumes his abuse of employees. For example, Tate chases and tackles an employee who has been avoiding him.  While the employee is on the floor, Tate stands over him and shouts "You can't be tippy-toeing up in here! Whoooooo!" before thrusting his pelvis and gesturing his hands toward his crotch, still standing over the employee.

47.     Similarly, after catching an employee playing computer games, Tate tackles him and, while still standing over him, shouts:

> You want to play games, Gene?  Well, Terry's back and I got a new game
> for you.  It's called "How Much Pain Can Gene Stand Before Gene Learns
> Not to Play Games Anymore?"  That's my game.  That's Terry's game.
> And when it's game time, it's pain time, baby!  Whooooo!

Tate then kicks the employee, still on the floor.

48.     The audience, consisting of 125 to 150 people, appeared to be shocked and offended at the video; the audience did not laugh at the presentation and seemed to be uncomfortable and hushed.

49.     Casselle one of only a few African Americans among the mostly Caucasian audience.

50.     The Tate character perpetuated racist stereotypes and was belittling to black men. Casselle was shocked and offended.

**Casselle Complains about the Racist Video**

51.     A few days after the meeting, Casselle sent what he meant to be an anonymous email to Fanny Rivera in the Civil Rights Office and Nancy Kalinowski, a FAA vice president who oversaw air traffic controllers nationally and who had attended the meeting. Kalinowski, a

Caucasian woman, was directly over Ellen King, the Director of SYS OPS and direct supervisor of the NOMs.

52.     In the email, Casselle explained his reasons for why he felt the video shown was racist and unprofessional.  Casselle also pointed out that the FAA had tolerated similar racist behavior in the past, and noted that the Command Center upper management lacks racial diversity.

53.     Specifically, Casselle explained that the video was a "clear reminder of the stereo-typical big African American Athlete who cannot speak but is used only for his brute force and intimidation."  Casselle also observed that the language in the video was inappropriate for a professional setting.

54.     Casselle also stressed that Artist's association of the video with Short was offensive and pointed out that, other than race, Short shared no characteristics that would cause one to associate Short with the Tate character.  Specifically, Casselle stated:

> Even more disturbing was the fact that he made reference to a recently retired large African American male as having the same effect on the Command Center employees as 'Terry Tate' did in the video.  [ . . . ] The retired individual that he was referring to was professionally articulate in every meeting and telcon [sic] that I attended.  Not once do I recall him ever bullying, cussing, or intimating in order to make his point.

55.     Casselle also advised Rivera and Kalinowski that Artist had stated that he regularly used Terry Tate videos in trainings.

56.     About a week later, Kalinowski replied to the email. Kalinowski confirmed that Artist had shown the video before and that several people had complained about it.  Kalinowski told Casselle that Artist would not be allowed to show the video again.

57.     Casselle received no response from Rivera or the Office of Civil Rights.

58.     Casselle did not respond to Kalinowski's email, but he was shocked that the FAA management had allowed Artist to continue to show such videos after receiving complaints.

59.     Casselle was a TMO assigned to Detroit during this incident.

60.     In 2011, Casselle attended another FAA Spring Season Meeting.  Like the 2010 End of Season Meeting, most SYS OPS personnel attended.

61.     At the conference, during a break, Ellen King called him over and introduced Casselle to Kalinowski.

62.     Casselle was surprised by the introduction because FAA personnel at Kalinowski's level usually spent their time at the End of Season meetings mingling with other high level executives and attending executive briefings.

63.     Casselle found the interaction awkward and its ending abrupt, if not terse.

64.     King introduced Casselle to Kalinowski because of Casselle's complaint about the Terry Tate video.

**After Casselle's Complaint, the FAA Refuses to Promote Him**

65.     In early 2013, Casselle began applying for SYS OPS jobs at ATCSCC again. Casselle applied to seven positions at ATCSCC from February 2013 to June 2013), including:

- System Efficiency Manager, Listing AEA-AJR-13-004-30043, which closed on 2/10/13.  The FAA did not choose any of the applicants and instead closed the listing and moved Steve McMahon, a former NOM, into the position. Casselle met the qualifications for this position.

- Support Manager, Listing AEA-AJR-13-006-30395, which closed on 2/15/13. Casselle received a debrief for this position and was told that he had done very well and finished second, but Frank McIntosh, a Caucasian male, had done

better on the interview.  Casselle met the qualifications for this position and

was more qualified than McIntosh for the position

- Staff Manager, Listing AEA-AJR-13-007-30414, which closed on 2/18/13.

  Casselle did not receive a debrief regarding why he was not selected for this

  position.  Casselle met the qualifications for this position.

- National Operations Manager NOM, Listing AEA-AJR-13-008-30583, which

  closed on 2/25/13.  Casselle did not receive a debrief regarding why he was

  not selected for this position.  Casselle met the qualifications for this position.

- National Operations Manager, Listing AEA-AJR-13-014-31029 Bid was closed or

  cancelled and no explanation giving. Bid closed on 6/19/2013.  Casselle met the

  qualifications for this position.

- Support Manager, Listing AEA-AJR-13-015-31030, which closed on 6/25/13.

  This listing was cancelled and Casselle did not receive a debrief regarding

  why he was not selected for this position.  Casselle met the qualifications for

  this position

- Staff Manager, Listing AEA-ATO-13-084-31096, which was closed or

  cancelled with no explanation on 6/27/2013. Casselle met the qualifications

  for this position.

66.     In April 2014, Casselle applied for a NOM position again, for listing AEA-AJR-
24-CHR-34895. By then, Casselle had three and a half years more experience in management
and overseeing operations at Detroit's high level facilities.  Casselle had also led several
successful initiatives at Detroit.

67.     Tisdall, as the Command Center Facility Manager, was the selecting officer for

the NOM position.

68.     The application process for the position began with submitting the application

package.  A candidate's application package included a resume detailing the candidate's

education, experience, and other qualifications known as "KSAs" (Knowledge, Skills, and

Abilities), as well as the candidate's answers to questions pertinent to the position.

69.     After the FAA evaluated the candidates' application packages, a number of

candidates were selected to move forward.

70.     A panel including Gregory Byus (a Caucasian male), Alyce Hood-Fleming (an

African-American female), and Steve Smith (a Caucasian male), then interviewed the candidates.

The interview consisted of seven questions that were approved by Tisdall, as the selecting

officer, and FAA Human Resources personnel.

71.     After conducting interviews, Rob Lowe and Tom Dalzell, both Caucasian males,

contacted candidates' supervisors for recommendations.  Lowe contacted Casselle's supervisor,

Anthony Wells.

72.     Lowe then summarized the supervisors' comments and, based on each

supervisor's comments, rated each candidate as "Highly Recommended," receiving 3 points,

"Recommended," receiving 2 points, "Mixed," receiving 1 point, or "Not Recommended,"

receiving 0 points.  Rob rated Casselle "Recommended."

73.     Tisdall debriefed Casselle via phone in mid-September 2014.

74.     During the phone call, Tisdall told Casselle that he was not selected for the

position.  Tisdall told Casselle that he had done "very well" in the application process, that

Casselle was a good candidate, and that Casselle was one of the top three candidates.  Yet,

Tisdall told Casselle that he was simply not selected.

75.     Tisdall also told Casselle that he had been one of the top two candidates in regards to KSAs and one of the top three candidates in regards to the interview.

76.     Tisdall advised Casselle that only one permanent NOM was selected, though during his interview, the panel had told Casselle that two permanent NOMs and one temporary NOM would be selected.

77.     Tisdall also advised Casselle that the current temporary NOM would remain in the position for the time being, but Casselle had applied for the permanent posting.

78.     Tisdall also told Casselle that Casselle's supervisor's recommendation was good, but not excellent, which had hurt him in the process.

79.     Tisdall did not give Casselle any legitimate reason for his non-selection and gave Casselle no guidance on how to improve his qualifications for consideration in the future.

80.     The Agency did not have a legitimate reason for failing to select Casselle for the NOM position.

**The FAA Promoted Less Qualified Candidates Over Casselle**

81.     Virginia Smith, Manager of Tactical Operations ("MTO") for the Great Lakes Region and Casselle's indirect manager, after a daily "telcon" between Smith and all of the TMOs told Casselle that Tisdall offered the permanent NOM position to Michael Richardson, a Caucasian male, and that Richardson had turned down the position.  Darnell Jones, who was responsible for facilitating classes at the Training Center, later told Casselle the same when Casselle was signing up for a class at the Training Center.

82.     Tisdall then offered to Brian (Jay) Clark, also a Caucasian male who, at the time, held a slightly junior position to Casselle.  Clark also turned down the position.

83.     Tisdall offered the temporary position to Bryan Beck, another Caucasian male.

84.     After Richardson and Clark turned down the permanent NOM position, the position was offered to Patrick Somersall, also a Caucasian male, who was in a lower position than and less qualified than Casselle.  Somersall accepted the position.

85.     Forty-six individuals applied for the April 2014 NOM position.  Of those forty-six candidates, the panel interviewed eleven.  Casselle was the only African American interviewed.

86.     Casselle's application package had the highest aggregate score of all forty-six candidates.

87.     Based on Casselle's qualifications regarding the categories of Leading People, Building Relationships, Leading Change, and Achieving Results, Casselle's application package received a score of 13 out of 16 points.

88.     Richardson received 12 points, Beck received 10 points, Clark received 9.5 points, and Somersall received 8.5 points.

89.     Casselle received the third-highest score on his interview, receiving 20 of 28 maximum points possible.

90.     Richardson received 22 points; Beck received 21 points, Clark received 16.5 points, and Somersall received 12.5 points.

91.     Casselle's supervisor recommended him for the NOM position, and Casselle received 2 points on his application for the recommendation.

92.     Richardson and Clark received 3 points each for their supervisor recommendations; Beck and Somersall, like Casselle, received two points.

93.     The aggregate scores for Casselle and the others offered the position were as follows:

|  | Casselle | Beck | Clark | Richardson | Somersall |
|---|---|---|---|---|---|
| KSAs | 13 | 10 | 9.5 | 12 | 8.5 |
| Interview | 20 | 21 | 16.5 | 22 | 12.5 |
| Supervisor Recommendation | 2 | 2 | 3 | 3 | 2 |
| Total | 35 | 33 | 29 | 37 | 23 |

94.     Casselle had been rated among the top two candidates, second only to Richardson.

**The FAA's Justifications for Casselle's Non-Selection are Pretextual**

95.     Tisdale indicated that Casselle was not selected for the position because Supervisor Recommendations were weighed more heavily than other parts of the selection process.

96.     However, Casselle received the same score on the supervisor recommendation as Beck and Somersall and Casselle scored higher overall than both.

97.     And, Tisdall gave this justification only after Casselle's non-selection.

98.     Additionally, Somersall and Joseph Verity (another candidate for the position) were supervised by Byus, a member of the selection committee.

99.     Tisdale also indicated that emphasis shifted to Command Center experience.

100.    Yet, neither Beck, Clark, nor Richardson had Command Center experience, and Command Center experience was not a requirement for the job.

101.    After the debriefing, Tisdall stated that the panel ranked only the first two candidates, and the panel placed the rest of the candidates into a pool.  Tisdall stated that the

panel had advised him that "he couldn't go wrong if he decided to select anyone from the pool."

102.    However, this conflicts with what Tisdale stated during his debrief with Casselle. Furthermore, Tisdall also stated again, after the debriefing, that Casselle had been ranked third overall.

103.    Tisdall also advised Casselle that he could not and would not hire Casselle full-time at the Command Center.

104.    Tisdale's reasons for Casselle's non-selection are pretext for retaliation against Casselle as a result of Casselle's complaint about the video in October 2010.

105.    As a result of the FAA's refusal to promote Casselle within SYS OPS, Casselle has been required to change career paths.

**COUNT I**
**Discrimination – Race**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.**
**Against the FAA**

106.    Casselle hereby incorporates all allegations set forth in all the foregoing paragraphs as though fully alleged herein.

107.    At all times relevant to this complaint, Casselle was an "employee" as defined by 42 U.S.C. § 2000e.

108.    At all times relevant to this complaint, the FAA was an "employer" as defined by 42 U.S.C. § 2000e.

109.    At all times relevant to this complaint, the FAA was aware of Casselle's race.

110.    The FAA, through its employees and/or managers, unlawfully subjected Casselle to and tolerated discrimination against Casselle because of his race during his employment with the FAA.

111.    Specifically, the FAA discriminated against Casselle because of his race in

September 2014 when it failed to promote him to the NOM position.

112.    The FAA had no legitimate business reasons for the adverse action it took against Casselle and its stated reasons for its adverse action against Casselle are pretext for race discrimination.

113.    This adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination based on Casselle's race.

114.    Casselle has been damaged as a result of the unlawful acts of the FAA

**COUNT II**
**Retaliation**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.**
**Against the FAA**

115.    Casselle hereby incorporates all allegations set forth in all the foregoing paragraphs as though fully alleged herein.

116.    Casselle engaged in protected activity under 42 U.S.C. § 2000 *et seq*. when he reported the video to Kalinowski in October 2010.

117.    Casselle reasonably believed that the video was discriminatory towards African Americans.

118.    The FAA took an unlawful adverse action against Casselle in September 2014 when it failed to promote him to the NOM position despite Casselle being the best-qualified candidate.

119.    The FAA's failure to promote Casselle to the NOM position was retaliation for Casselle reporting Artist's racist video to Kalinowski.

120.    The FAA had no legitimate business reasons for failing to promote Casselle.

121.    The FAA's stated reasons for failing to promote Casselle are pretext for retaliation for Casselle's complaint of discrimination.

122.    These adverse actions occurred under circumstances that raise a reasonable

inference of unlawful discrimination based on Casselle's protected activity as the FAA treated

Casselle less favorably than his coworkers who have not complained of race discrimination.

123.    Casselle has been damaged as a result of the unlawful acts of The FAA.

**COUNT III**
**Retaliation**
**United States Constitution, First Amendment**
**Against Tisdall**

124.    When Casselle objected to the "Terry Tate" video, Casselle was speaking as a

citizen, outside of the scope of his duties for the FAA.

125.    When Casselle objected to the "Terry Tate" video, Casselle was addressing

matters of public concern, i.e., wide-spread and blatant race discrimination in the Agency.

126.    Because Casselle objected to the "Terry Tate" video, Tisdall refused to select

Casselle for the NOM position in September 2014.

127.    It is clearly established that refusing to select someone for employment because

that person opposed race discrimination in his workplace is illegal.

128.    At the time Tisdall refused to select Casselle for the NOM position in September

2014, a reasonable public official would have understood that refusing to select someone for

employment because that person opposed race discrimination in his workplace is illegal.

129.    Casselle has been damaged as a result of Tisdall's unlawful acts.

**PRAYER FOR RELIEF**

Based on the foregoing, Casselle respectfully requests that he be awarded the following

relief against the FAA:

a.      placement in a NOM position or a substantially similar position with retroactive

seniority from the time of injury, and abatement of the retaliatory conduct directed toward him,

or alternatively, front pay;

b.      economic damages for lost wages and benefits, including back pay, interest on the

back pay, and compensation for any special damages sustained as a result of the discrimination;

c.      liquidated damages;

d.      compensatory damages, including damages for mental and emotional distress and

harm to reputation;

e.      punitive damages to punish the Defendant for malicious acts of retaliation and to

deter it from similar retaliatory conduct toward other employees; and

f.      reasonable litigation costs, expert fees, and reasonable attorney's fees, together

with all other relief available from law and equity.

## JURY DEMAND

Casselle demands a trial by jury so that any and all issues proper may be so tried.


Respectfully submitted,


_/s/ Andrea Downing_____
R. Scott Oswald, DC Bar No. 458859
Andrea M. Downing, DC Bar No. 1005865
*Attorneys for Plaintiff*
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006
(202) 261-2823
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
adowning@employmentlawgroup.com

Dated: September 25, 2015