**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **PERRY CASSELLE,** | |
| **Plaintiff,** | |
| **v.** | Civil Action No. 15-1570 (JEB) |
| **ANTHONY FOXX, SECRETARY, UNITED STATES DEPARTMENT OF TRANSPORTATION,** *et al.*, | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Perry Casselle is an employee of the Federal Aviation Agency who suspects that his email complaining about an allegedly racist video shown at an FAA meeting has grounded his chances at promotion. He brings suit against both the FAA and Anthony C. Tisdall, a National Operations Manager there who oversaw selection for a position that Plaintiff did not obtain. Casselle alleges that his complaint about the video was protected activity under Title VII and that the FAA has unlawfully retaliated against him by denying a promotion for which he was qualified.

In addition to the Title VII claims against the FAA, Casselle also brings a count against Tisdall, alleging that he violated Plaintiff's First Amendment free-speech rights by retaliating against him for voicing his concerns about the video. Only that last count is in question here, as Defendant has moved to dismiss it alone. Tisdall contends that because Title VII is the sole and exclusive remedy for charges of race discrimination and retaliation in the workplace, Casselle's

First Amendment claim is preempted.  Agreeing that such count cannot fly, the Court will grant

the Motion.

## I.      Background

According to the Complaint, which the Court must presume as true at this stage, Perry

Casselle is a mid-50s black male from Virginia who has worked at the Federal Aviation Agency

for 28 years.  See Compl., ¶¶ 12, 22.  Since 2010, he has been a Traffic Management Officer in

the Traffic Management Unit; in this role he is responsible for overseeing all air traffic at

particular airports to which he is assigned.  Id., ¶ 26.  Defendants include both the FAA, an

agency of the U.S. Department of Transportation, and Tisdall, the National Operations Manager

whose actions are central to Casselle's suit and this Motion.  Id., ¶¶ 13, 15, 29.  Tisdall was one

of five so-called NOMs, each of whom is responsible for a U.S. region with approximately 52

TMOs (including Casselle) serving beneath them.  Id., ¶¶ 27, 29.

### A.   Showing of Video

Plaintiff states that his troubles with the FAA began when an allegedly offensive video

was shown at an October 2010 national End of Season Meeting with FAA managers and other

personnel.  Id., ¶ 40.  The meeting marked the occasion for the retirement of one of the five

NOMs, Rico Short.  Id., ¶¶ 33, 43.  One of Short's fellow NOMs, Mike Artist, attempted a roast

of Short by playing a video entitled "Terry Tate takes a Vacation," "show[ing] the video as [a]

depiction of Short's role at the [Air Traffic Control System Command Center]."  Id., ¶¶ 33, 42-

43.  Casselle's Complaint suggests that the roast – like most roasts – was well intentioned but

poorly executed.  According to the Complaint, "The video depicted a large, black male

character," "Terrible Terry Tate," who ran "around a hotel, verbally and physically threatening

staff to do their jobs."  Id., ¶ 44.  The character's job was to increase office efficiency, which he

achieves by way of "threats, violence, and verbal abuse."  Id., ¶ 45. Throughout, Terrible Terry

Tate tackles and shouts at employees who avoid him, and in one scene he "thrust[s] his pelvis

and gesture[s] his hands toward his crotch, . . . standing over the employee," id., ¶ 46, while in

another vignette, he kicks an employee lying on the floor.  Id., ¶ 47.  Casselle, "one of only a few

African Americans" in attendance, states that the "mostly Caucasian audience" of roughly 125-

150 people "appeared to be shocked and offended by the video" and "did not laugh at the

presentation and seemed to be uncomfortable and hushed."  Id., ¶¶ 48-49.  Casselle too was

"shocked and offended," for the "Tate character perpetuated racist stereotypes and was belittling

to black men."  Id., ¶ 50.

B.  Casselle's Email

A few days after that meeting, Casselle sent what was intended to be an anonymous email

to the FAA's Civil Rights Office and to Nancy Kalinowski, a white woman who had attended the

meeting.  Id., ¶ 51.  Kalinowski was Casselle's bosses' boss: as one of the FAA's vice

presidents, she supervised Ellen King, who in turn supervised the NOMs, including Artist and

Tisdall.  Id.  Plaintiff explained in his email that he felt the video was racist and unprofessional,

with language inappropriate for a professional setting.  Id., ¶¶ 52-53.  The video was "a 'clear

reminder of the stereotypical big African American Athlete who cannot speak but is used only

for his brute force and intimidation.'"  Id., ¶ 53.  He was particularly upset with Artist's

association of the video with Short because "other than race, Short shared no characteristics that

would cause one to associate Short with the Tate character."  Id., ¶ 54.  In contrast to "'Terrible'

Terry Tate," he considered Short to be "professionally articulate in every meeting . . . that [he]

attended.  Not once did [Plaintiff] recall him ever bullying, cussing, or intimating [*sic*] in order to

make his point."  Id.  Casselle was also offended that Artist stated that he had regularly used

Terry Tate videos in trainings, id., ¶ 55, and noted that "the FAA had tolerated similar racist

behavior in the past." Id., ¶ 52. He also complained that upper management at the FAA lacked

racial diversity. Id.

The response Casselle received fell short of his expectations. Kalinowski replied a week

later, confirming that Artist had shown the video before and that "several people had complained

about it." Id., ¶ 56. She promised him that Artist would not be allowed to do so again. Id.

Plaintiff was "shocked that the FAA management had allowed Artist to continue to show such

videos after receiving complaints." Id., ¶ 58. Casselle never received a response from the Office

of Civil Rights. Id., ¶ 57. Kalinowski also shared his concerns with the NOMs under her

management at the Warrenton, Virginia, Command Center, presumably including Tisdall. Id.,

¶ 5.

   C. Failure to Obtain Promotion

Casselle here charges that his email complaining about racial discrimination at the FAA

has caused him to lose out on promotions, and he names Tisdall specifically in one count

because he thinks "Tinsdall violated Casselle's First Amendment rights when Tisdall refused to

select Casselle for the NOM position in September 2014," during which time Defendant was the

selecting officer. Id., ¶¶ 8, 16. Casselle believes this refusal was "in retaliation for [his]

complaint against [Tisdall's] comrade NOM," Artist. Id., ¶ 11. For the purposes of this Motion

to Dismiss, the Court need not delve deeply into this selection process; suffice it to say that

Casselle applied for an NOM position in April 2014, and despite being told he was one of the top

three candidates and had done "very well," was informed by Tisdall that he had not been selected

for the position. Id., ¶¶ 66-74. Plaintiff complains that Tisdall gave him no "legitimate reason

for his non-selection" and "no guidance on how to improve his qualifications for consideration in

the future." Id., ¶ 79.  He believes that the agency had no good basis for failing to select him for the NOM position.  Id., ¶ 80.

Having administratively exhausted his claim through the DOT's Equal Employment Opportunity procedures, id., ¶¶ 18-23, he now brings suit here, raising counts of racial discrimination and retaliation in violation of Title VII against the FAA alone, id., ¶¶ 106-123, and one of retaliation in violation of the First Amendment against only Tisdall.  Id., ¶¶ 124-129. Tisdall here moves to dismiss this last claim on the ground that Title VII provides the exclusive and preemptive administrative and judicial scheme for redress of federal-employment discrimination.  See MTD at 1.

## II.     Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted."  In evaluating Defendants' Motion to Dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1250 (D.C. Cir. 2005).  The notice-pleading rules are "not meant to impose a great burden upon a plaintiff," Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 347 (2005), and he must thus be given every favorable inference that may be drawn from the allegations of fact.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 584 (2007).

Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, id. at 555, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(quoting <u>Twombly</u>, 550 U.S. at 570).  Plaintiff must put forth "factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

<u>Id.</u>  The Court need not accept as true "a legal conclusion couched as a factual allegation," nor an

inference unsupported by the facts set forth in the Complaint.  <u>Trudeau v. Fed. Trade Comm'n</u>,

456 F.3d 178, 193 (D.C. Cir. 2006) (quoting <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986)

(internal quotation marks omitted)).  For a plaintiff to survive a 12(b)(6) motion, moreover, the

facts alleged in the complaint "must be enough to raise a right to relief above the speculative

level."  <u>Twombly</u>, 550 U.S. at 555–56 (citing <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974)).

## III.    Analysis

Defendant presents a single and straightforward legal question: is Casselle's First

Amendment claim against Tisdall preempted by Title VII?  To find the answer, the Court first

explores the interplay between Title VII and constitutional – in particular, speech-related –

claims.  It next examines whether the content of the speech in question restates claims that may

be brought under Title VII.  Answering that inquiry in the affirmative, the Court will grant

Defendant's Motion.

### A.  Title VII Preemption Standard

Title VII guarantees that nearly all federal employees be "free from any discrimination

based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16.  The statute

provides "complementary administrative and judicial enforcement mechanisms designed to

eradicate federal employment discrimination," and the Supreme Court has long held that it is

"the exclusive, pre-emptive administrative and judicial scheme for the redress of federal

employment discrimination."  <u>Brown v. Gen. Services Admin.</u>, 425 U.S. 820, 829, 831 (1976).

The question, then, is whether Casselle's First Amendment claim against Tisdall is so covered.

In general, "[a]bsent a showing that Title VII provides inadequate protection for [a plaintiff's] rights, a federal employee urging unlawful discrimination is confined to actions under that statute.  Hence, a direct constitutional action by an employee against an agency of the United States or its officials would be foreclosed . . . ."  Morris v. Washington Metro. Area Transit Auth., 702 F.2d 1037, 1040 (D.C. Cir. 1983) (citation omitted).  This includes alleged violations of the First Amendment.  See Lage v. Thomas, 585 F. Supp. 403, 405-06 (N.D. Tex. 1984) ("[J]urisdiction has . . . been denied in suits tying [Title VII] actions with . . .  First Amendment claims . . . ."); see also Bush v. Lucas, 462 U.S. 367, 368 (1983) (declining to authorize nonstatutory damages remedies for federal employees whose First Amendment rights are violated by their superiors because "such claims arise out of an employment relationship that is governed by comprehensive procedural and substantive provisions").

"Although federal employees may not bring constitutional claims for employment discrimination that is actionable under Title VII," the statute "does not preclude separate remedies for unconstitutional action other than discrimination based on race, sex, religion, or national origin."  Velikonja v. Mueller, 315 F. Supp. 2d 66, 76 (D.D.C. 2004), aff'd in part, rev'd in part on other grounds sub nom. Velikonja v. Gonzales, 466 F.3d 122 (D.C. Cir. 2006) (citation omitted) (emphasis added).  Indeed, "[n]othing . . . suggests that Congress intended to prevent federal employees from suing their employers for constitutional violations against which Title VII provides no protection at all."  Ethnic Employees of the Library of Cong. v. Boorstin, 751 F.2d 1405, 1407, 1415 (D.C. Cir. 1985) (emphasis added) (finding retaliation for speech that was "highly critical of Library [of Congress] policies" was not covered under – and therefore not preempted by – Title VII).

B.  Preemption of First Amendment Claim

The Court must thus determine whether Title VII potentially provides relief for the actions Casselle took and the constitutional violations he alleges.  Plaintiff's First Amendment count states that when he "objected to the 'Terry Tate' video, Casselle was speaking as a citizen, outside of the scope of his duties for the FAA," and was "addressing matters of public concern, i.e., wide-spread and blatant race discrimination in the Agency."  Compl., ¶¶ 124-25.  In retaliation for this, he alleges that "Tisdall refused to select Casselle for the NOM position" and that "refusing to select someone for employment because that person opposed race discrimination in his workplace is illegal."  Id., ¶¶ 126-27.

Disputing Plaintiff's characterization of his claim as one that raises a matter of public concern, Defendant argues that he is merely "recasting his Title VII employment discrimination claim as a constitutional claim."  MTD at 4.  The Court agrees.  Casselle's complaint about the video was that it constituted racial discrimination in the workplace.  As a result of raising his objections to his superiors, he alleges he was retaliated against by Tisdall's decision not to select him for the NOM position.  This is a classic claim of retaliation for complaining of racial discrimination, activity that lies at the heart of what Title VII aims to protect.  See Walker v. Johnson, 798 F.3d 1085, 1091 (D.C. Cir. 2015) ("Title VII prohibits the federal government from discriminating against employees on the basis of race, or retaliating against them because they opposed an unlawful employment practice . . . .") (citation omitted).

As Defendant crisply points out in his Reply, Casselle's allegations of protected activity in his "Count II: Title VII Retaliation" almost perfectly mirror the activities he identifies in "Count III: First Amendment."  Compare Compl., ¶ 116 ("Casselle engaged in protected activity under [Title VII] when he reported the [Terry Tate] video . . . ."), with id., ¶ 125 ("When

Casselle objected to the 'Terry Tate' video, Casselle was addressing . . . wide-spread and blatant

race discrimination in the Agency.").  In similar fashion, the retaliation alleged under the two

counts also appears to be a near mirror image.  Compare id., ¶ 118 ("The FAA took an unlawful

adverse action against Casselle . . . when it failed to promote him . . . ."), with id., ¶ 126-27

("Because Casselle objected to the 'Terry Tate' video, Tisdall refused to select Casselle for the

NOM position . . . [and i]t is clearly established that refusing to select someone for employment

because that person opposed race discrimination in his workplace is illegal."); see also Reply at

4-5.  The entire content of Casselle's speech here, therefore, was in protest of racial

discrimination at the FAA.  Put succinctly, "where a plaintiff alleges facts that are actionable

under Title VII and for which Title VII provides a remedy, Title VII preempts virtually all other

federal causes of action that provide consistent theories of relief."  Rochon v. F.B.I., 691 F.

Supp. 1548, 1555 (D.D.C. 1988).

There are a few exceptions to this broad preemption scheme, but none applies here.  In

limited circumstances, "an adverse employment action taken because of an employee's speech

on matters of public concern [can be] independently actionable under the First Amendment"

when "plaintiff's claim rests upon alleged retaliation for speech on an issue not related to . . .

[their] discrimination claim or to protected activities conducted to seek redress for [such] alleged

discrimination." Velikonja, 315 F. Supp. 2d at 76 (emphasis added).  On a few occasions, the

D.C. Circuit has allowed First Amendment suits arising from complaints of discrimination in the

workplace to proceed.  Yet those cases have either not involved an invocation of Title VII, see

Tao v. Freeh, 27 F.3d 635, 640, 641 & n.6 (D.C. Cir. 1994) (permitting First Amendment claim

to go forward where plaintiff's complaint of discrimination in workplace was "matter of serious

public import that was broader than her individual personnel dispute" but noting that question of

"Title VII [preemption] [wa]s not in this case, and consequently . . . [the Court did] not decide it"), or have involved speech that was indisputably unrelated to what Title VII covers.  See Boorstin, 751 F.2d at 1415 (permitting First Amendment claim to proceed where plaintiffs raised "constitutionally protected criticisms of Library policies" and other "assertions [that] clearly fall outside the scope of Title VII").  Casselle's claims, in contrast, fall squarely within the ambit of Title VII.

Plaintiff attempts a red-herring rebuttal by offering that Title VII may ultimately not afford him relief, depending on the outcome of his suit.  In other words, he fears that "[i]f this Court or a jury finds that Casselle did not engage in protected activity under Title VII, Title VII cannot provide . . . any remedy . . . for Casselle's claims."  Opp. at 1, 5 (citing Lewis v. Snow, No. 01-7785, 2003 WL 22077457 (S.D.N.Y. Sept. 8, 2003)).  He argues that because Defendants "do not concede that [his] complaint [about the video] is protected activity under Title VII," "[o]ne of the issues in this case is whether . . . [it was] 'protected activity'."  Id. at 5.

Defendant correctly counters by identifying the "false premise" underlying Plaintiff's argument: Casselle confuses whether a claim is cognizable under Title VII with whether he may ultimately succeed on the merits in proving each element of that claim.  See Reply at 2.  The proper question is thus not whether this Court or a jury might ultimately find that Casselle actually engaged in activity protected by Title VII.  Instead, the issue is whether "an alleged constitutional violation . . . is cognizable under Title VII, i.e., [is] capable of being adjudicated by a Court."  Worth v. Jackson, 377 F. Supp. 2d 177, 182 (D.D.C. 2005), aff'd in part, vacated in part and reversed on other grounds, 451 F.3d 854 (D.C. Cir. 2006).  A claim of unlawful retaliation for complaining about race discrimination in the workplace clearly is – indeed, such claims make up a healthy portion of this district's docket.  Plaintiff therefore has no remedies-

related barrier to seeking relief and must simply prove – like any plaintiff – that the facts support his claim.  That burden, however, does nothing to undermine Defendant's correct assertion that the First Amendment count is preempted by Title VII.

## IV.      Conclusion

Because Plaintiff's First Amendment claim consists solely of grievances actionable under Title VII, the Court concludes that such statute provides an adequate remedy and thus preempts his constitutional course of action.  The Court will thus grant Defendant's Motion to Dismiss as to Count III in the accompanying Order.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  July 1, 2016