# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PERRY CASSELLE,

    **Plaintiff,**

    v.

ELAINE L. CHAO, Secretary, U.S.
Department of Transportation,

    **Defendant.**

Civil Action No. 15-1570 (JEB)

## MEMORANDUM OPINION

Plaintiff Perry Casselle began working at the Federal Aviation Agency in 1988, and for almost two decades ascended steadily through the bureaucratic ranks. His upward trajectory was cut short, however, in 2014, when he was passed over for the job of National Operations Manager. Casselle, who is black, alleges in this suit that his non-selection for this position was both in retaliation for a complaint he made in 2010 and the result of racial discrimination. Defendant counters by asserting a nondiscriminatory rationale for its hiring decision – namely, a need to select candidates with experience in the FAA Command Center.

In a prior Opinion, the Court dismissed Plaintiff's First Amendment claim against the relevant hiring official, Anthony Tisdall. See Casselle v. Foxx, 195 F. Supp. 3d 270 (D.D.C. 2016). Defendant now moves for summary judgment on the remaining Title VII retaliation and discrimination counts. As to the former, the Court agrees that Casselle has failed to establish a genuine issue of material fact; although Plaintiff engaged in protected activity and suffered an adverse employment action, he has not presented evidence of any relationship between the two. As to the latter, conversely, the Court concludes that Casselle has submitted sufficient evidence

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PERRY CASSELLE,

    **Plaintiff,**

    v.

ELAINE L. CHAO, Secretary, U.S.
Department of Transportation,

    **Defendant.**

Civil Action No. 15-1570 (JEB)

## MEMORANDUM OPINION

Plaintiff Perry Casselle began working at the Federal Aviation Agency in 1988, and for almost two decades ascended steadily through the bureaucratic ranks. His upward trajectory was cut short, however, in 2014, when he was passed over for the job of National Operations Manager. Casselle, who is black, alleges in this suit that his non-selection for this position was both in retaliation for a complaint he made in 2010 and the result of racial discrimination. Defendant counters by asserting a nondiscriminatory rationale for its hiring decision – namely, a need to select candidates with experience in the FAA Command Center.

In a prior Opinion, the Court dismissed Plaintiff's First Amendment claim against the relevant hiring official, Anthony Tisdall. See Casselle v. Foxx, 195 F. Supp. 3d 270 (D.D.C. 2016). Defendant now moves for summary judgment on the remaining Title VII retaliation and discrimination counts. As to the former, the Court agrees that Casselle has failed to establish a genuine issue of material fact; although Plaintiff engaged in protected activity and suffered an adverse employment action, he has not presented evidence of any relationship between the two. As to the latter, conversely, the Court concludes that Casselle has submitted sufficient evidence

to keep aloft his claim of racial discrimination. This count is cleared to proceed to trial.

## I.    Background

As required at summary judgment, the facts here are set forth in the light most favorable

to Plaintiff. Perry Casselle has now worked at the Federal Aviation Agency for almost three

decades. See ECF No. 34 (Amended Complaint), ¶¶ 2, 32; ECF No. 38 (MSJ), Attach. 2 (Def.

Statement of Material Facts), ¶¶ 2, 3. By 2010, Casselle had become a Traffic Management

Officer (TMO), a position in which he was responsible for overseeing all air traffic at the Detroit

Metropolitan Wayne County Airport. See MSJ, Exh. A (Deposition of Perry Casselle) at 17:22-

18:6. Four years later, however, Casselle was passed over for a job as a National Operations

Manager (NOM). See DSMF, ¶ 49. This case concerns the circumstances of that hiring

decision.

### A.  2010 Video

Plaintiff alleges that his employment troubles began when a NOM named Mike Artist

presented an allegedly offensive video at the October 2010 End of Season Meeting. Id., ¶¶ 52-

56. The video, which was shown to an audience of 200 FAA managers and other personnel, was

a 2002 Reebok commercial entitled "Terry Tate Takes a Vacation." Id., ¶¶ 55-56. The

commercial features former pro linebacker Lester Speight, who is black, as the character

"Terrible Terry Tate," an overly zealous office worker who is finally forced to take a resort

vacation. Id. Displeased by the prospect of lounging by the pool, the commercial shows Tate

instead berating the hotel employees and threatening staff to do their jobs. As stated in the

Complaint, Tate uses "threats, violence, and verbal abuse," kicks an employee lying on the

ground, and, in one scene, "thrust[s] his pelvis and gesture[s] his hands toward his crotch . . .

standing over the employee." Am. Compl., ¶¶ 54-55.

Casselle, "one of only a few African Americans" in attendance at the meeting, states that the audience "appeared to be shocked and offended by the video." Id., ¶¶ 57-58; Exh. 6 (Plaintiff's Response to Interrogatory 3) at 8-9. Casselle certainly was. Two weeks after the showing of the Tate video, Casselle expressed his concerns in an email to Nancy Kalinowski, one of the FAA's vice presidents, on which he copied Ellen King, the Director of System Operations, and Fanny Rivera, who worked in the FAA's Civil Rights Office. See DSMF, ¶ 57. In his message, which was sent from his personal email address, arl.5308@aol.com, Plaintiff explained that he felt that the Terry Tate video was racist and unprofessional. Id., ¶¶ 58-59. The commercial, Casselle wrote, was "a clear reminder of the stereotypical big African American Athlete who cannot speak but is used only for his brute force and intimidation." ECF No. 39 (Opposition to MSJ), Exh. 7 (Email Complaint) at 2. In particular, Casselle objected to the fact that Artist had, in what was seemingly a (failed) attempt at humor, associated the video with a recently retired NOM named Rico Short. Id. Short is also black, and Plaintiff took umbrage at Artist's suggestion that Short's behavior as a NOM resembled that of Terrible Terry Tate on his vacation rampage. Id. In contrast to Tate, Plaintiff wrote that Short was "professionally articulate in every meeting" and that "[n]ot once do I recall him ever bullying, cussing, or intimidating in order to make his point." Id. Casselle also expressed his concern that the upper management at the FAA lacked racial diversity, concluding, "[S]hame on us if we allow the good old-boy network to remain alive [and] well." Id. at 3. Casselle signed the email "Concerned FAA Manager" and intended for the complaint to be anonymous. Id.

Four hours after Casselle sent his email, Kalinowski replied. See Email Compl. at 1. Addressing her response to "FAA Manager," Kalinowski began her email by thanking the author for the "very thoughtful note." Id. She acknowledged that the video was "offensive,"

apologized for its showing, and offered her assurances that "we will take [the complaint] very seriously." Id. In response to Casselle's remarks regarding the diversity of the FAA Command Center, Kalinowski stated that it was "an area that we are actively addressing" and wrote that the Center was "looking for diverse candidates with various backgrounds to fill vacancies" and would "continue our outreach to be even more representative." Id. In addition to sending her response to Casselle, Kalinowski coped Ellen King, Fanny Rivera, Maria Fernandez-Greczmiel, the chair of the Accountability Board, and Pilar Madera, the Director of Administration. Id.; MSJ, Exh. S (Deposition of Nancy Kalinowski) at 20:8-19. At the time, Casselle was "satisfied with the response" to his email complaint. See MSJ, Exh. B (Deposition of Perry Casselle) at 126:6-16.

B. Failure to Obtain 2014 NOM Promotion

Four years after the Terrible Terry Tate incident, Casselle applied to become a NOM. See DSMF, ¶ 8; Casselle Depo. at 174:17-175:8. NOMs are responsible for "air traffic operations . . . throughout [the FAA] system across the entire country." MSJ, Exh. Z (Deposition of Johnnie Garza) at 25:12-15. Although NOMs receive the same base salary as TMOs, Casselle's position at the time, the NOM position is higher profile and more desirable. See Casselle Depo. at 5. There are only four to six NOMs in the entire FAA, and, according to Casselle, NOMs often go on to have additional opportunities both within the government and the private sector. See MSJ, Exh. D (Deposition of Anthony Tisdall) at 22:5-6, 23:21-24:12. As a result, when two open NOM positions were posted in April 2014, Casselle was eager to apply.

The FAA received 46 applications for the NOM posting, which were each evaluated by the FAA's Human Resources department. See DSMF, ¶ 12. The candidates were given numerical scores based on their responses to Knowledge, Skills, and Abilities (KSA) questions,

relevant experience, and supervisor recommendations.  Id., ¶¶ 14-16.  From these assessments, eleven applicants were eventually selected to be interviewed by a panel.  See Tisdall Depo. at 75:18-20.  Although there were two black candidates in the initial pool of 46, Casselle was the only black applicant interviewed by the panel.  See Opp., Exh. 12 (Referral List Summary).  Totaling all of the quantitative assessments, Casselle received the second-highest cumulative score.  Id. at 20; Opp., Exh. 13 (Review of Candidates Application Packages).

In June 2014, the FAA official in charge of hiring, Anthony Tisdall, offered the NOM positions to Michael Richardson, a white male who had the highest total score on the quantitative assessments, and to Jay Clark, a white male who had the third-highest score.  See DSMF, ¶¶ 30-36; Tisdall Depo. at 76:21-77:4. That same month, both Richardson and Clark declined these offers.  See DSMF, ¶¶ 32, 36.  Three months later, in September 2014, Casselle was notified that he was not selected as a NOM.  See Casselle Decl. at 2.  Instead, Tisdall had hired Patrick Somersall and had promoted Joe Varrati from a temporary to a permanent NOM position.  See Tisdall Depo. at 83:11-15, 20-21.  Both Somersall and Varrati are white, and both scored significantly lower than Casselle on the various quantitative assessments.  See Opp., Exh. 13 (Review of Candidates' Application Packages); Opp., Exh. 18 (Supervisor Recommendation Scores); Opp., Exh. 19 (Scoring Matrix); Referral List Summary.  Somersall and Varrati, however, had each previously worked in the FAA's central Command Center, while Casselle did not have such prior experience.  See Tisdall Depo. at 98:7-9.

C.  Procedural History

After having been informed of his non-selection as a NOM, Casselle contacted a counselor with the Department of Transportation Equal Employment Opportunity Division, alleging racial discrimination and retaliation.  See Am. Compl., ¶ 18.  The parties attempted to

resolve the allegations in mediation and dispute whether or not, over the course of those negotiations, Plaintiff was ultimately offered a permanent NOM position. See Casselle Depo. at 226:3-11; MSJ at 10-11 Eventually, however, Casselle withdrew from the mediation process and, on January 14, 2015, he filed a formal complaint with DOT. See Am. Comp., ¶ 20. Having administratively exhausted his claims through DOT's EEO procedures, Casselle filed his Complaint in this Court on September 25, 2015, which he amended on March 22, 2016. Id., ¶¶ 18-23. Plaintiff's Amended Complaint alleged: (1) Racial discrimination under Title VII against the FAA; (2) Unlawful retaliation under Title VII against the FAA; and (3) Violations of the First Amendment against Anthony Tisdall. Defendant subsequently brought a motion to dismiss the third count, which this Court granted in its prior Opinion. See Casselle v. Foxx, 195 F. Supp. 3d 270 (D.D.C. 2016). What remains are Plaintiff's allegations of racial discrimination and retaliation in violation of Title VII. See Am. Compl., ¶¶ 13-14. The FAA now moves for summary judgment on both counts. See ECF No. 38.

## II. Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or

"showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-movant is required to provide evidence that would permit a reasonable jury to find in his favor. See Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

III.    **Analysis**

Two questions are presented here: (1) Could a reasonable jury infer that Casselle's non-selection as a NOM was motivated by racial discrimination?; and (2) Could a reasonable jury conclude that the FAA unlawfully retaliated against Casselle for having complained about the 2010 video?. The Court concludes that Plaintiff prevails on the first, but succumbs on the second. The discrimination claim may proceed to trial.

A.  Legal Framework

Casselle brings his employment claims under Title VII of the Civil Rights Act of 1964, which was enacted to implement "the federal policy of prohibiting wrongful discrimination in the Nation's workplaces."  Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2522 (2013).  The statute's anti-discrimination provision "makes it unlawful for an employer 'to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race'" or other protected characteristics. See Steele v. Schafer, 535 F.3d 689, 695 (D.C. Cir. 2008) (quoting 42 U.S.C. § 2000e–2(a)). The anti-retaliation prong makes it unlawful for "an employer [to] 'discriminate against' an employee . . . because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 56 (2006) (quoting 42 U.S.C. § 2000e–3(a)).

To make out a claim under Title VII, a plaintiff may rely on direct or circumstantial evidence that "permits an inference of discrimination" or retaliation.  See Holcomb v. Powell, 433 F.3d 889, 899 (D.C. Cir. 2006).  Where, as in this case, the plaintiff proffers only circumstantial support, his claim is governed by the familiar framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under this test, a plaintiff must first make out a prima facie case.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). For a claim of retaliation, he does so by showing that "(1) []he engaged in a statutorily protected activity; (2) []he suffered a materially adverse action by [his] employer; and (3) a causal connection existed between the two."  Wiley v. Glassman, 511 F.3d 151, 155 (D.C. Cir. 2007). This third prong requires proof that the desire to retaliate was "the but-for cause of the

challenged employment action." Nassar, 133 S. Ct. at 2528 (emphasis added). To establish a *prima facie* case for discrimination, alternatively, the plaintiff must show that "(1) []he is a member of a protected class; (2) []he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." Wiley, 511 F.3d at 155. Unlike the retaliation case, a showing of discrimination does not require that the plaintiff establish but-for causation. Rather, he need only show that "race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors" contributed. See 42 U.S.C. § 2000e-2(m) (emphasis added); Desert Palace, Inc. v. Costa, 539 U.S. 90, 101-02 (2003).

Once a plaintiff has made out his *prima facie* case, the burden then shifts to the defendant to come forward with a legitimate, nondiscriminatory reason for the challenged action. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254–55 (1981). If the employer articulates such a justification for its hiring decision, "the burden-shifting framework" then "falls away, and the 'central question' becomes whether 'the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory [or non-retaliatory] reason was not the actual reason and that the employer intentionally discriminated [or retaliated] against the employee.'" Allen v. Johnson, 795 F.3d 34, 39 (D.C. Cir. 2015) (quoting Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008)). That is not to say, however, that evidence of a *prima facie* case is wholly shunted from the inquiry on a motion for summary judgment. On the contrary, in answering the sufficient-evidence question, the Court must consider "the total circumstances of the case," including strengths and weaknesses in "the plaintiff's *prima facie* case," along with other evidence adduced by both parties during discovery. See Evans v. Sebelius, 716 F.3d 617, 620 (D.C. Cir. 2013) (citing Hamilton v.

Geithner, 666 F.3d 1344, 1351 (D.C. Cir. 2012)); Allen, 795 F.3d at 39 n.4 ("To say that the burden-shifting framework falls away under Brady is not to suggest that the evidence supporting the *prima facie* case loses relevance."); accord Grosdidier v. Broad. Bd. of Governors, Chairman, 709 F.3d 19, 25 (D.C. Cir. 2013).

B.  Discrimination

Plaintiff alleges that the FAA's hiring decision was motivated by racial discrimination. Specifically, Casselle claims that he was intentionally passed over for the NOM position in favor of less-qualified white candidates.  Defendant responds that the NOMs were selected not from any racial bias, but because of their superior Command Center expertise.  The question before this Court is whether Plaintiff is able to "point to record evidence that is sufficient for a reasonable jury to disbelieve the veracity of" the proffered reason for the adverse action.  See Mount v. Johnson, 174 F. Supp. 3d 553, 563 (D.D.C.), aff'd, 664 F. App'x 11 (D.C. Cir. 2016). Here, Casselle does demonstrate that the total circumstances of this case could give rise to an inference that the FAA's rationale is, in fact, pretext for discrimination.

The argument here hinges upon the legitimacy of the Agency's alleged justification for failing to select Casselle as a NOM. Tisdall avers that he began looking for candidates with Command Center experience in June, after Clark and Richardson had turned down the position, but before it was offered to Varrati or Somersall.  See Tisdall Depo. at 66:1-12.  The summer is the severe-weather and high-volume season for the Command Center, and Tisdall testified that, as the season began, he realized that the Center was lacking in experienced staff.  Id. at 66:13-67:1.  He maintains that he decided to emphasize Command Center experience in hiring the new NOMs as a way to "mitigate" that deficit and to provide consistency within the Center's

operation.  Id.

In response, Casselle contends that Tisdall's justification for selecting Varrati and Somersall is merely cover for racial discrimination.  Plaintiff offers three main arguments in support of his position.  First, he asserts that Command Center experience was not a requirement for the NOM position, and that Tisdall deviated from FAA internal policies when he changed the relevant qualifications during the hiring process.  See Opp. at 36.  Second, he claims that he was more qualified than Varrati and Somersall, the individuals ultimately selected for the NOM positions.  Id.  Finally, Casselle maintains that Tisdall offered shifting explanations for the selection of these candidates during discussions before and throughout litigation.  Id.  The Court addresses each of these arguments in turn.

*1. Change in Qualifications*

Plaintiff's initial contention in favor of pretext is that, by changing the criteria for the NOM position midway through the hiring process, Tisdall violated FAA policy.  Employees "may cast doubt on the employer's proffered reason by, among other things, pointing to . . . the employer's failure to follow established procedures or criteria."  Evans, 716 F.3d at 620; see Lane v. Vasquez, 961 F. Supp. 2d 55, 67 (D.D.C. 2013) ("Inconsistencies or irregularities in an employer's established hiring policies may [] support a finding of discrimination.").  Here, Defendant's Rule 30(b)(6) witness, Tracy Cotton, suggested in her testimony that an *ad hoc* change in hiring criteria would likely be improper.  Cotton testified that hiring managers are supposed to use the "predetermined criteria and benchmarks" to "make sure that the competition is a fair and open competition . . . not modified from candidate to candidate."  Opp., Exh. 5 (Deposition of Tracy Cotton) at 45:13-21.  Although she testified that a shift in hiring priorities would not necessarily violate FAA policy, Cotton also stated that if "the circumstances have

changed [and] you now need someone . . . with this [different] experience[,] . . . that job should be rebid." Id. at 62:17-20. According to Cotton, if the hiring official was "not going to conduct a new round of interviews, or at least articulate that [he was] looking at these positions through a different lens, then [he] should use the same standards." Id. at 47:2-6.

As Tisdall acknowledges, it was only after Clark and Richardson declined their job offers that Command Center expertise became a clear priority in selecting a NOM. See Tisdall Depo. at 82:3-6. It was then that Tisdall "started looking at Command Center experience as being one of the primary criteria in filling the position." Id. at 70:8-13. By the time the offers to Varrati and Somersall were made, Tisdall testified that experience in the Center had become a "determinative factor" in his hiring process, id. at 81:10-20, and that the "selection criteria did change" when he began to focus on Command Center experience. Id. at 82:9-12. He asserted, moreover, that there was "no documentation" regarding this shift in hiring because it was all done through "verbal discussion with the director and with my staff." Id. at 87:7-10.

Pointing to this testimony, Casselle maintains that Tisdall violated FAA policy when he sua sponte decided that Command Center experience would be a necessary condition for being hired as a NOM. In response, Defendant attempts to distinguish between altering the emphasis put on certain hiring criteria and an actual change in the baseline qualifications. See MSJ at 10. The FAA asserts that it was not the requirements for the NOM position that shifted over the summer, but the needs of the Command Center. See Reply at 8. Yet Casselle's evidence shows that Command Center experience was never listed as a factor in the NOM job posting, and that such experience had not previously been considered necessary for the job. See Garza Depo. at 32:11-19; Opp., Exhs. 16 (NOM Position Announcement); 17 (NOM Job Description). Indeed, neither Clark nor Richardson, the first two applicants selected, had prior experience in the

Center.  See Tisdall Depo. at 77:18-20; 80:3-5.  Defendant can hardly claim, then, that considering such experience as a "determinative factor" represented merely a shift in priorities.  Rather, a factfinder could conclude that it introduced an entirely new qualification into the mix – a qualification that, by Tisdall's own admission, prevented Casselle from being hired.  See Tisdall Depo at 90:18-91:1-6.  Plaintiff is correct in claiming that this evidence supports an inference of pretext.

### 2. Better Qualified

Plaintiff's second pretext argument is that he was more qualified than Varrati and Somersall, the individuals ultimately selected as NOMs.  See Opp. at 38.  A jury may infer discrimination from evidence showing that "a reasonable employer would have found the plaintiff significantly better qualified for the job."  Holcomb, 433 F.3d at 897.  For an inference of pretext to arise from such a gap, however, the plaintiff must possess a "stark superiority of credentials," Porter v. Shah, 606 F.3d 809, 816 (D.C. Cir. 2010) (quoting Stewart v. Ashcroft, 352 F.3d 422, 429 (D.C. Cir. 2003)), such that the distinction between the candidates is "great enough to be inherently indicative of discrimination."  Jackson v. Gonzales, 496 F.3d 703, 707 (D.C. Cir. 2007) (internal quotation marks omitted).

Here, Plaintiff obtained better scores than both Varrati and Somersall on the quantitative assessments used during the selection process.  See Review of Candidates' Application Packages at 1; Supervisor Recommendation Scores at 1; Scoring Matrix at 1.  These scores consisted of KSA questions, prior experience, an in-person interview, and a supervisor recommendation.  Casselle obtained a score of 13 on his KSAs, as compared with Somersall's score of 8.5 and Varrati's score of 9.  See Review of App. Packages at 1.  He was scored a 5 on experience, the same as Somersall but higher than Varrati's score of 4.  See Supervisor Rec. Scores at 1.

Plaintiff's supervisor recommendation was scored as a 2 out of 3, the same as Somersall, but Varrati's recommendation was a 1. Id. On the interview portion, Casselle was awarded a score of 20, while Somersall was given a 12.5. See Scoring Matrix at 1. Varrati, due to his low supervisor-recommendation score, was never given an in-person interview by the panel during the selection process. See DSMF, ¶¶ 24, 28. On no qualification did Casselle score lower than Somersall or Varrati, and, across all metrics, Plaintiff received a cumulative score of 40, Somersall of 28, and Varrati of 14. See Review of Candidates' Application Packages at 1; Supervisor Rec. Scores at 1.

Casselle claims that these numbers demonstrate his objective superiority for the NOM position and thus raise an inference of discrimination. The FAA counters that, although Casselle received better quantitative scores, he nonetheless was less qualified than Somersall or Varrati because he lacked Command Center expertise – a factor the FAA alleges was becoming increasingly important at the time of selection. See MSJ at 9-10. Defendant thus urges the Court to look beyond the applicants' relative scores, arguing that such metrics do not accurately reflect the qualifications of each candidate. That may well be true. On the basis of this record, however, it would also be possible for a jury to infer that the disparity in the quantitative scores is indicative of discrimination. This is particularly plausible given that, as discussed above, Casselle casts doubt upon the legitimacy of the weight given to Command Center experience during the hiring process. If a jury were to find this rationale pretextual, it follows that Command Center expertise would also not be a sufficient justification for hiring candidates who scored significantly lower on the objective metrics.

The Court notes, moreover, that Tisdall's justification for selecting Varrati and Somersall relied in part upon his subjective assessments of the two men. Although "employers may of

course take subjective considerations into account in their employment decisions," this Circuit has previously noted its concern that subjective criteria may be used to "camouflage discrimination." Hamilton v. Geithner, 666 F.3d 1344, 1356 (D.C. Cir. 2012) (citation omitted); Harris v. Group Health Ass'n, Inc., 662 F.2d 869, 873 (D.C. Cir. 1981) (noting that "subjective criteria lend themselves to racially discriminatory abuse more readily than do objective criteria"). Here, Tisdall testified that he offered Somersall the NOM position in part because of his personal opinions of Somersall based on their time working together, and to Varrati in part because he was a "good guy" and the "team seemed to like him." Tisdall Depo. at 168:25-22, 169:1-18, 68:1-4, 144:2-9. "Particularly in cases where a jury could reasonably find that the plaintiff was otherwise significantly better qualified than the successful applicant, an employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination." Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1298 (D.C. Cir. 1998). In this case, a jury could reasonably infer that Tisdall's subjective justifications for selecting Somersall and Varrati were, in fact, camouflage for racial bias. This inference, moreover, is not rebutted by Defendant's assertion that Tisdall eventually offered Casselle a permanent NOM position. The basic facts of this (alleged) offer are in dispute, see Casselle Depo. at 226:3-11; MSJ at 10-11, and Defendant acknowledges that any offer was not made until at least four months after Somersall and Varrati were selected, and after Plaintiff had filed his informal employment complaint accusing Tisdall of racial bias. See DSMF, ¶¶ 67-68. The fact that Tisdall ultimately may have been willing to offer Plaintiff the job thus does not preclude a reasonable jury from finding pretext and racial discrimination with respect to the initial hiring process.

### 3. Shifting Explanations

Casselle's final argument in favor of pretext is that Defendant has failed to provide a

consistent explanation for his non-selection as a NOM. As this Circuit has previously held, "[S]hifting and inconsistent justifications" for an adverse employment action are "probative of pretext." <u>Geleta v. Gray</u>, 645 F.3d 408, 413 (D.C. Cir. 2011); <u>Brown v. Howard Univ. Hosp.</u>, 172 F. Supp. 3d 187, 195–96 (D.D.C. 2016) (denying summary judgment where "an employer offered in litigation a different reason for terminating an employee than the rationale it had previously relied upon"). Here, Plaintiff focuses his argument on the alleged differences between Tisdall's explanations for his hiring decision during a September 2014 phone call and those during litigation.

After being informed of his non-selection for the NOM position, Casselle had a "debriefing" conversation with Tisdall, during which Plaintiff asked him about the selection process and ways in which he could improve any future applications for promotion. <u>See</u> Casselle Depo. at 41:4, 54:2-6. Casselle avers that, during this call, Tisdall never mentioned the need for Command Center expertise as the rationale for Plaintiff's non-selection. <u>Id.</u> at 41:1-43:16; 51:22-54:17. Rather, Casselle states that Tisdall told him that he had done "very well," and that he was one of the top three candidates for the job. <u>See</u> Plaintiff's Resp. to First Set of Interrog. at 12. Plaintiff claims that the only reason Tisdall gave for his non-selection was that, while Casselle's supervisor recommendation was "good but not excellent," two other candidates received an excellent recommendation. <u>Id.</u> at 13. This disparity in recommendations, Tisdall said, had "hurt" Casselle in the selection process. <u>Id.</u>

In his testimony, Tisdall did not directly rebut Casselle's account of the debriefing call, but instead stated that he did not recall the specifics of the conversation. <u>See</u> Tisdall Depo. at 172:16. Tisdall claimed, however, that he believed that he "would have given" Plaintiff information regarding the need for Command Center experience during the debriefing call. <u>Id.</u> at

172:3-8.  Construing the evidence in the light most favorable to Casselle, the record shows that

Tisdall may have offered shifting explanations for his decision not to select Casselle.

"[E]vidence that an employer has offered shifting rationales . . . is generally sufficient to create

an issue of fact for the jury," Clendenny v.  The Architect of the Capitol, 236 F. Supp. 3d 11, 25

(D.D.C. 2017), and here a reasonable jury could infer that Tisdall's arguable failure to mention

Command Center experience during the debriefing call is indicative of pretext.

At summary judgment, "the judge's function is not himself to weigh the evidence and

determine the truth of the matter but to determine whether there is a genuine issue for trial."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Considering the evidence in the

light most favorable to Casselle, this Court cannot conclusively say that the FAA's decision was

in fact based on its proffered nondiscriminatory rationale.  While a reasonable jury might so

infer, it might instead believe that the explanation was merely pretext for passing over Casselle

in favor of two white candidates.  Resolving such conflicting inferences is the function of the

jury, not the court at summary judgment.

C.  Retaliation

In addition to racial discrimination, Casselle alleges unlawful retaliation under Title VII.

Although his Complaint mentions retaliation in connection with the FAA's failure to promote

him to two positions in 2013 and 2015, see Am. Compl., ¶¶ 7-8, 151-52, it appears that he

withdrew these claims during his deposition, and he has not raised them in his Opposition to

Defendant's instant Motion.  See Casselle Depo. at 94:1-22; Opp. at 1.  The Court will therefore

focus exclusively on Plaintiff's claims related to his non-selection as a NOM in 2014.

Casselle asserts that he was not chosen for the NOM position as retaliation for his 2010

email complaint regarding the Terry Tate video.  In response, Defendant offers a legitimate, non-

retaliatory rationale. As discussed above, the FAA contends that Casselle was passed over for the NOM position not because of his earlier complaint, but because he lacked experience working in the agency's central Command Center. Although the Court finds that this reason may be pretextual with respect to Plaintiff's discrimination count, this conclusion does not automatically preclude summary judgment with respect to the retaliation claim. This Circuit requires that a plaintiff establish <u>both</u> that the proffered reason is pretextual <u>and</u> that the employer intentionally retaliated against the employee. <u>See</u> <u>Adeyemi v. District of Columbia</u>, 525 F.3d 1222, 1226 (D.C. Cir. 2008); <u>Walker v. Johnson</u>, 798 F.3d 1085, 1093 (D.C. Cir. 2015) (holding plaintiff must show "that a reasonable jury could not only disbelieve the employer's reasons, but conclude that the real reason the employer took a challenged action was a prohibited one"). Under this standard, a court must consider whether the plaintiff has presented sufficient evidence of retaliatory intent – including looking to his *prima facie* case. <u>See</u> <u>Aka</u>, 156 F.3d at 1289, 1291; <u>Gray v. Foxx</u>, 637 F. App'x 603, 607 (D.C. Cir. 2015) (holding that question of retaliation may be resolved in favor of employer "based <u>either</u> upon the employee's failure to rebut [employer's] explanation <u>or</u> upon the employee's failure to prove an element of her case"). Here, Casselle is simply unable to make such a showing.

As both parties seemingly agree, Casselle meets the first two elements of the *prima facie* test. <u>See</u> Opp. at 29; MSJ at 11. His email to Kalinowski and subsequent EEO complaints qualify as protected activities, and his non-selection as a NOM was an adverse employment action. <u>See</u> <u>Kalinoski v. Gutierrez</u>, 435 F. Supp. 2d 55, 69 (D.D.C. 2006) (holding non-selection is adverse employment action); <u>McIntyre v. Peters</u>, 460 F. Supp. 2d 125, 135 (D.D.C. 2006) (addressing Title VII claims based on non-selection). The remaining dispute is therefore over Casselle's ability to demonstrate that, "but for" his protected activity, he would have been

selected as a NOM. On this point, Defendant denies the existence of any "causal connection between the anonymous complaint about the video and the non-selection four years later." MSJ at 11. This instinct is sound, as the Court agrees that Casselle cannot show the requisite nexus between his 2010 complaint and his failure to obtain the NOM position in 2014. There is, consequently, insufficient proof of retaliatory intent to warrant a trial.

To begin, Casselle's retaliation case must overcome the significant temporal gap between the Terry Tate email and the alleged retaliation. When an employee's protected activity and a subsequent adverse action are close in time, the proximity may support a "causal inference" of retaliation. See Moore v. Castro, 192 F. Supp. 3d 18, 44 (D.D.C. 2016). Although the Supreme Court has not definitively established the length of time that gives rise to such an inference, it has suggested that periods of over three months may be too temporally remote to establish causation. See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001) (citing with approval circuit cases finding three and four months to be too long a gap to give rise to causal inference of retaliation). Here, the gap is not four months, but four years.

The Court recognizes that a plaintiff will not necessarily be foreclosed from making out a *prima facie* case despite a lack of immediacy between the protected activity and the adverse action. See Kalinoski, 435 F. Supp. 2d at 70 ("Title VII, of course, does not say that retaliation must be immediate for it to be actionable."). Yet, the "greater the time that has elapsed between the protected activity and the alleged [adverse] acts [,] . . . the more difficult it is for a complainant to justify an inference of causal connection between the two." Glenn v. Williams, 2006 WL 401816, at *25 (D.D.C. Feb. 21, 2006), aff'd sub nom. Dickens v. Dep't of Consumer & Regulatory Affairs, 298 F. App'x 2 (D.C. Cir. 2008). Plaintiff must therefore support his retaliation claim with evidence sufficient to overcome this chronological obstacle.

This Casselle cannot do. Indeed, Plaintiff presents no evidence that <u>anyone</u> in the FAA even knew that he was the author of the 2010 email complaint. Casselle sent the complaint anonymously from his personal email and signed it "Concerned FAA Manager." DSMF, ¶¶ 51, 59. The email address, arl.5308@aol.com, did not identify Casselle – in fact, the address includes no aspect of his name or initials – nor did his complaint contain any description of his race or specific position at the FAA. <u>See</u> Email Compl. at 2. Casselle nonetheless argues that a jury could reasonably infer that he was identified as the author because an online search of the email address, conducted in 2016, associates the account with his full name. <u>See</u> Opp. at 33; <u>id.</u>, Exh. 11 (Results of 2016 Spokeo Social Search). Such a position amounts to nothing more than unfounded speculation. There is no evidence in the record that anyone at the FAA ever searched for the identity of the author of the email, and Kalinowski testified that she had never determined who sent the complaint. <u>See</u> Kalinowski Depo. at 20:2-7. Nor is there evidence that an online search, if conducted in 2010, would have revealed Casselle's connection to the email account.

Plaintiff's argument that he was identified as the sender of the email via "process of elimination" is similarly unavailing. <u>See</u> Plaintiff's Resp. to First Set of Interrog. at 20. Casselle alleges that Defendant could have determined that he was the author because he was one of only two black individuals in the audience when the Terry Tate video was shown. <u>Id.</u> This hypothesis, however, ignores the fact that nowhere in his email did Casselle mention his race, nor is it clear from the email that the author was objecting to the video because of his <u>own</u> racial identity. <u>See</u> Email Compl. at 2-3. The contention that Defendant could have deduced that Plaintiff sent the complaint simply because he was one of 200 people at the annual meeting is therefore mere surmise. Put simply, Casselle intended for his email to be anonymous, and there is no indication that his identity was ever exposed.

Even if Plaintiff <u>had</u> been identified as the sender of the 2010 email, moreover, there is no basis for inferring that such information would have found its way to Tisdall, who made the NOM selection. Casselle initially sent the email complaint to Kalinowski, King, and Rivera. <u>See</u> Email Compl. at 1; DSMF, ¶ 57. Kalinowski in turn forwarded it to a number of FAA employees, and it eventually was distributed directly to Artist. <u>See</u> DSMF, ¶¶ 61-62. There is, however, no evidence in the record to suggest that Tisdall ever received a copy, and Casselle does not attempt to make any such claim. He instead asserts that Tisdall knew of the email (and knew that he was the sender) because he was told by King or one of the other NOMs. <u>See</u> Opp. at 33. Plaintiff additionally contends that, because Tisdall and Artist were allegedly "very close friends," a jury could infer that Artist would have told Tisdall about the complaint. <u>See</u> Am. Compl. at 1; Opp. at 33. Again, however, this claim is far too speculative to demonstrate causation in the absence of any actual evidence.

Although the facts at summary judgment are construed in the light most favorable to the non-moving party, that party must "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). "Speculation alone cannot create triable facts," <u>Robinson v. Paulson</u>, 591 F. Supp. 2d 78, 91 (D.D.C. 2008), and here Plaintiff can offer nothing more. Because Casselle has failed to show that he was identified as the author of the email, or that, if he was, such information was relayed to Tisdall, he cannot demonstrate the necessary link between his protected activity and the adverse action. <u>See</u> <u>Morris v. McCarthy</u>, 825 F.3d 658, 674 (D.C. Cir. 2016) ("[A]n employee cannot survive summary judgment if a jury can do no more than 'speculate' that her employer knew of her protected activity.").

Given the weakness of Plaintiff's evidence as to his *prima facie* case and his failure to

provide any basis upon which a reasonable jury could infer that, but for his 2010 complaint, he would have been hired as a NOM, the Court shall grant Defendant's Motion for Summary Judgment on the retaliation claim.

*       *       *

As a final point, the Court notes that the parties have raised issues relating to potential limits on any monetary damages Plaintiff could ultimately recover.  See MSJ at 11-12; Opp. at 39-40; Reply at 16.  Although the Court acknowledges that he may have an uphill battle on this question, it finds that such concerns are more appropriate for resolution as *in limine* matters before trial than at summary judgment.

**IV.    Conclusion**

For the foregoing reasons, the Court will grant in part and deny in part Defendant's Motion for Summary Judgment.  A contemporaneous Order will so state.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  September 15, 2017